OPINION
{¶ 1} Appellant-Mother Betty McClintock aka Betty Oiler appeals the July 24, 2007, judgment of the Muskingum County Court of Common Pleas, Juvenile Division, denying her Motion for Reconsideration of the permanent surrender agreement entered into by her as to her minor children.
 {¶ 2} This case comes to us on the accelerated calendar. App.R. 11.1 which governs accelerated calendar cases, provides in pertinent part:
 {¶ 3} "(E) Determination and judgment on appeal. The appeal will be determined as provided by App.R. 11.1. It shall be sufficient compliance with App.R. 12(A) for the statement of the reason for the court's decision as to each error to be in brief and conclusionary form. The decision may be by judgment entry in which case it will not be published in any form."
 {¶ 4} This appeal shall be considered in accordance with the aforementioned rule.
 STATEMENT OF FACTS AND LAW {¶ 5} Appellant-Mother Betty McClintock aka Betty Oiler is the natural mother of Whitney McClintock, (D.O.B. 9/12/95) and Roger George, Jr. (D.O.B. 6/24/94), minor children.
 {¶ 6} On September 20, 2006, Appellee Muskingum County Children Services (hereinafter "MCCS") filed a Complaint alleging the minor children to be neglected and dependent, and requesting a disposition of Temporary Custody to MCCS or alternatively Permanent Custody to MCCS. Their involvement occurred after Appellant-Mother called the agency and reported to them that she was homeless and could no *Page 3 
longer take care of her children. She told the agency that she wanted to give up custody of her children due to their behavioral problems and that she had placed the children with a family friend.
 {¶ 7} Appellant-Mother previously had three other children removed from her care and adopted.
 {¶ 8} MCCS filed a Motion for Pre-Dispositional Interim Orders along with the Complaint. The hearing was held that same date. Appellant-Mother appeared and requested the Magistrate to allow the children to be present during the shelter care hearing. The Magistrate granted said request over the opposition of MCCS. Appellant-Mother sat through the hearing. The child Whitney McClintock was allowed to cross-examine MCCS witnesses, and call witnesses on the mother's behalf. At the conclusion of the hearing the children were placed in the Temporary Custody of MCCS per Entry dated September 20, 2006.
 {¶ 9} Subsequent to the hearing, Mindy Darst was assigned as the ongoing caseworker. Caseworker Darst attempted to work with Appellant-Mother towards reunification. However, Appellant-Mother expressed her desire to voluntarily surrender her children. After caseworker Darst was assured that Appellant-Mother's desire to surrender was a thought-out decision, a meeting between Appellant-Mother and adoption-coordinator Heather Mock was arranged. Appellant-Mother and Heather Mock met on October 10, 2007, to go over the permanent surrender paperwork, and to discuss the ramifications of such a decision.
 {¶ 10} Subsequently, the trial court conducted a hearing on October 18, 2007, to determine whether or not the voluntary surrender would be approved. At said hearing, *Page 4 
the trial court explained the ramifications of the voluntary surrender to Appellant-Mother, and made inquiries to ensure that Appellant understood what she was doing and that she was entering into the agreement voluntarily. Appellant expressed that she knew what she was doing, understood what she was doing, and that no one was making her enter into the voluntary surrender agreement. Following said hearing, the trial court approved the voluntary surrender.
 {¶ 11} On November 1, 2006, the father of the children appeared in court and voluntarily surrendered his rights to the children.
 {¶ 12} MCCS moved to dismiss its Complaint and the Entry approving the Motion was filed November 16, 2006.
 {¶ 13} On May 7, 2007, Appellant-Mother filed a Motion for Reconsideration.
 {¶ 14} On July 16, 2007, the trial court held a hearing on said motion. At the hearing, Appellant-Mother was represented by counsel. Counsel called two witnesses and Appellant-Mother to the stand to testify on behalf of Appellant-Mother. Three MCCS Caseworkers testified on behalf of MCCS. At the conclusion of the hearing, the Court took the matter under advisement.
 {¶ 15} The trial court filed an Entry July 24, 2007, denying Appellant's Motion for Reconsideration. The trial court's Entry states in part as follows:
 {¶ 16} "Based on the evidence, the Court finds that when she surrendered her children, Betty Oiler [Appellant] understood the adoption process and ramification of entering into the voluntary permanent surrender agreement . . . The Court further finds that she entered into the permanent surrender agreement voluntarily and any decisions in filling out the forms were made voluntarily." *Page 5 
 {¶ 17} Appellant now appeals the trial court's denial of the Motion for Reconsideration.
 ASSIGNMENT OF ERROR {¶ 18} "I. THE JUVENILE COURT ERRED IN DENYING APPELLANT'S MOTION FOR RECONSIDERATION."
 I. {¶ 19} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, 1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. CE. Morris Co. v. Foley Construction (1978),54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 20} Revised Code § 5103.15(B)(1) allows the parents of a child to enter into an agreement with a public children services agency to surrender the child into the permanent custody of the agency, so long as the agreement is approved by a juvenile court:
 {¶ 21} "(B)(1) Subject to, except as provided in division (B)(2) of this section, juvenile court approval, the parents, guardian, or other persons having custody of a child may enter into an agreement with a public children services agency or private child placing agency surrendering the child into the permanent custody of the agency. An *Page 6 
agency that enters into such an agreement may take and care for the child or place the child in a family home.
 {¶ 22} "A private child placing agency or public children services agency that seeks permanent custody of a child pursuant to division (B)(1) of this section shall file a request with the juvenile court of the county in which the child has a residence or legal settlement for approval of the agency's permanent surrender agreement with the parents, guardian, or other persons having custody of the child. Not later than fourteen business days after the request is filed, the juvenile court shall determine whether the permanent surrender agreement is in the best interest of the child. The court may approve the permanent surrender agreement if it determines that the agreement is in the best interest of the child and, in the case of an agreement between a parent and an agency, the requirements of section 5103.151 of the Revised Code are met. The agency requesting the approval of the permanent surrender agreement shall file a case plan, prepared pursuant to section 2151.412
of the Revised Code, with the court at the same time that it files its request for the approval of the permanent surrender agreement.
 {¶ 23} "(2) The parents of a child less than six months of age may enter into an agreement with a private child placing agency surrendering the child into the permanent custody of the agency without juvenile court approval if the agreement is executed solely for the purpose of obtaining the adoption of the child. The agency shall, not later than two business days after entering into the agreement, notify the juvenile court. The agency also shall notify the court not later than two business days after the agency *Page 7 
places the child for adoption. The court shall journalize the notices it receives under division (B)(2) of this section."
 {¶ 24} "It is the Juvenile Court's function in consenting to a permanent surrender to insure that the surrender is made by the parent voluntarily, with full knowledge of the legal import of the relinquishment of parental rights accomplished thereby." In reMiller (1980), 61 Ohio St.2d 184, 191, 399 N.E.2d 1262.
 {¶ 25} A permanent surrender agreement may be set aside where the parent's consent is deemed involuntary. See, e.g., Marich v. Knox Cnty.Dept. of Human Serv. (1989), 45 Ohio St.3d 163, 543 N.E.2d 776 (holding parental consent invalid based on exercise of undue influence by the public agency that obtained custody of the child).
 {¶ 26} In Kozak v. Lutheran Children's Aid Soc. (1955),164 Ohio St. 335, syllabus, the Supreme Court of Ohio held:
 {¶ 27} "[u]nder Section 5103.15, Revised Code, where the parents, guardian, or other persons having the custody of a child make an agreement surrendering such child into the permanent custody of an association or institution of this state, established for the purposes of aiding, caring for, and placing children in homes * * *, and where such agreement is voluntarily made, without fraud or misrepresentation, and is accepted by the association or institution, the agreement is irrevocable except with the consent of the association or institution."
 {¶ 28} The Supreme Court reaffirmed its holding in Kozak in In reMiller (1980), 61 Ohio St.2d 184, 189, where it cited Kozak, and stated, "[a]n agreement by a child's parents or legal guardian to surrender a child to the permanent custody of a certified association or institution described in R.C. 5103.15 constitutes a contract where *Page 8 
accepted by such association or institution and when voluntarily made without fraud or misrepresentation. * * * Such a contract cannot be revoked by the parents or legal guardian absent the consent of the association or institution." (Footnote omitted.)
 {¶ 29} Under R.C. § 5103.15, a parent can enter into an agreement with a public children services agency for either "temporary custody or surrender of permanent custody." Thus, the Supreme Court concluded that, "[a] temporary surrender may, of course, be revoked, but a permanent surrender is exactly what its name signifies — one made forever."Kozak, supra, at 342. "If an agreement for such permanent surrender can be withdrawn, it would seem silly to provide in [R.C. 5103.15] for both a temporary surrender and a permanent surrender. There would be no difference between them." Id.
 {¶ 30} In the instant case, Appellant-Mother is now claiming that she signed the permanent surrender agreement under duress, i.e. under threat of incarceration, and therefore her actions were not voluntary. She alleges that she was threatened with incarceration by both Rhonda Hinkle and Heather Mock. She further claims that she lied at the surrender hearing when asked if she had been threatened in any way.
 {¶ 31} In reviewing an issue of duress in a case where a parent surrenders custody of a child, "the courts now seek to determine whether the threats were such as to have overcome the will of the person threatened and to have created a state of mind such that he was induced to do an act which he would not otherwise have done and which he was not bound to do." In re Hua (1980), 62 Ohio St.2d 227, 405 N.E.2d 255, citing Tallmadge v. Robinson (1952), 158 Ohio St. 333, 109 N.E.2d 496. Ultimately, the issue to be determined in this case is whether the plaintiff "really had a choice" when she relinquished her custodial rights, and had the freedom of exercising her own will. *Page 9 
See Hua, supra; see also McHenry v. Children's Home of Cincinnati
(1989), 65 Ohio App.3d 515 .
 {¶ 32} Upon review of the record of the permanent surrender hearing, this Court finds that the trial court explained to Appellant-Mother that by entering into the surrender agreement all her rights as a parent to the child will end, including all rights to visitation and the right to consent to the child's adoption. (10/18/06 T. at 4-5). Appellant-Mother acknowledged that she understood what she was signing when she signed the permanent surrender agreement as to her two children. (10/18/06 T. at 1-2). She further acknowledged that such document was reviewed with her by the Agency and that no one "took advantage" of her to get her to sign the documents. (10/18/06 T. at 1-2). When asked by the trial court why she wanted to voluntarily surrender custody of her children, Appellant-Mother stated:
 {¶ 33} "Because I want the best for them and with me they are not going to have the best life so I want the best for them and I think being in a foster home, being adopted out with other people, there would be, have a best life." (10/18/06 T. at 5).
 {¶ 34} When asked by the trial court why the children would not have a good life with her, she replied:
 {¶ 35} "Because of my family history and because of my, me, well I hang with my family. My family is mean to them and stuff like that so its [sic] best that they stay away from my family. (10/18/06 T. at 5).
 {¶ 36} Later, when advised by the trial court that it was going to approve the agreement because it seemed that Appellant-Mother knew what she was doing, she stated: *Page 10 
 {¶ 37} "I know what I am doing." (10/18/06 T. at 6).
 {¶ 38} The trial court then inquired as to whether anyone from the agency promised her anything to persuade her to sign the agreement. She answered in the negative. (10/18/06 T. at 7).
 {¶ 39} Lastly, the trial court made the following inquiry:
 {¶ 40} "Did [the agency] threaten you in any way? Did they tell you if you didn't sign them, they were going to file for permanent custody and taken them away anyway?
 {¶ 41} Appellant-Mother again answered in the negative. (10/18/06 T. at 7).
 {¶ 42} At the hearing on her motion for reconsideration of the trial court's decision to approve such surrender, Appellant-Mother claimed that she had been threatened by Rhonda Hinkle, the initial investigator for the agency, right before the shelter-care hearing, that if she did not sign the surrender papers she was going to go to jail for neglect. (7/16/07 T. at 3-5). She stated that she had an outstanding warrant for fines and that she was afraid of being sent to jail. She further claimed that she lied at the surrender hearing when the judge made inquiries of her as to any threats that may have been made to her. Id.
 {¶ 43} Going back to the transcript from the shelter care hearing, we find that Appellant-Mother's actions at said hearing do not appear to be those of someone who felt threatened to not fight for her children. At said hearing, Appellant-Mother challenged the temporary custody. She also asked that her children be allowed to be present during said hearing and used her daughter Whitney to direct questions to the witnesses. When the State attempted to call Appellant-Mother on cross-examination, the trial court gave her the following warning: *Page 11 
 {¶ 44} ". . . I would also note that she gave whatever testimony in evidence that she has presented to the Court prior to being warned of the possible consequences, and so I'm at least going to warn her and give her that option. I think you, Miss Oiler, the State is requesting that you would be called as a witness and required to answer the State's questions. Now you need to understand that certainly we are recording these proceedings and any testimony or evidence that you would give here today could potentially be used against you in evidence later in a possible criminal endanger, child endangering or neglect action." (9/20/06 T. at 32)
 {¶ 45} The trial court further explained:
 {¶ 46} "That's why I'm trying to inform you. That yes your actions could have in the past and still could have potential criminal liability for you with a possible jail sentence and or fines. So you have a right not to testify here today and certainly not to testify until you've had an opportunity to consult with and be advised by an attorney." (9/20/06T. at 33).
 {¶ 47} Appellant-Mother elected at that time not to testify on her own behalf at the shelter care hearing.
 {¶ 48} In addition to Appellant-Mother's testimony at the hearing on the motion to reconsider, her mother, Mary Woods, and her second cousin, Frankie Johannes, also testified that they heard threats being made to Appellant-Mother. Ms. Woods testimony was that she heard Heather Mock threaten her daughter. Ms. Johannes could not recall when such threats were made.
 {¶ 49} The trial court then heard testimony from Rhonda Hinkle, Mindy Darst, Appellant-Mother's ongoing case worker with the agency, and Heather Mock, the *Page 12 
adoption coordinator. Each of these witnesses denied that Appellant-Mother was ever threatened with being sent to jail if she did not sign the surrender papers. Ms. Hinkle testified that she has nothing to do with permanent surrender actions and that her role is to investigate, and if necessary, file for temporary custody. (7/16/07 T. at 32). At that point, her role ends. Id. She further testified that prior to the shelter care hearing, Appellant-Mother had informed her that she no longer wanted her children but that she changed her mind at the hearing and challenged the motion for temporary custody. (7/16/07 T. at 33-34).
 {¶ 50} Mindy Darst testified that Appellant-Mother informed her that she did not want a case plan, and that she wanted to give her children up instead. (7/16/07 T. at 38-39). She testified that she set up a second appointment with Appellant-Mother and made another trip to her house to again discuss reunification. Appellant-Mother again stated that she did not want reunification and refused to attend scheduled visitation with her children. (7/16/07 T. at 39). Ms. Darst testified that it was at this time that Appellant-Mother informed her that she wanted to do a permanent surrender of her children because she knew that they would have a better life that way. Id. Ms. Darst stated that Appellant-Mother later went to the agency office where she met with Ms. Darst and Heather Mock and executed the permanent surrender papers. Id. She further testified that at such meeting it was explained to Appellant-Mother that she would never see her children again, that the children would be adopted and that her name would be removed from their birth certificates. (7/16/07 T. at 41).
 {¶ 51} Heather Mock testified that when Appellant-Mother signed the surrender forms on October 10, 2007, she was informed that she could change her mind any time *Page 13 
prior to the hearing, which was held on October 17, 2007. (10/18/06 T. at 52). She further testified that Appellant-Mother's demeanor was "bubbly" on the car ride to the surrender hearing. (10/18/06 T. at 52). After the hearing, she stated that Appellant-Mother showed no emotion and did not appear to be upset. (10/18/06 T. at 53). She further stated that Appellant-Mother refused to have a "good-bye visit" with her children. Id.
 {¶ 52} Based on the foregoing, this Court finds that trial court had before it competent, credible evidence on which to base its decision that Appellant-Mother's decision to enter into a permanent surrender agreement, seven months prior to the filing of her motion for reconsideration, was made voluntarily and was not made under duress.
 {¶ 53} For the foregoing reasons, Appellant's sole assignment of error is overruled, and the judgment of the Court of Common Pleas, Juvenile Division, Muskingum County, Ohio, is affirmed.
Wise, J. Gwin, P. J., and Farmer, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Juvenile Division, Muskingum County, Ohio, is affirmed.
 Costs assessed to Appellant. *Page 1